## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Middlesex Water Company, | : | |
| | : | |
| Plaintiff, | : | Case No. |
| | : | |
| v. | : | Hon. |
| | : | |
| Pennsylvania Public Utility | : | |
| Commission; Gladys Brown | : | |
| Dutrieuille, Chairperson of the | : | Electronically Filed |
| Pennsylvania Public Utility | : | |
| Commission, in her official capacity; | : | |
| Stephen M. DeFrank, Vice | : | |
| Chairperson of the Pennsylvania | : | |
| Public Utility Commission, in his | : | |
| official capacity; Ralph V. Yanora, | : | |
| Commissioner on the Pennsylvania | : | |
| Public Utility Commission, in his | : | |
| official capacity; Kathryn L. Zerfuss, | : | |
| Commissioner on the Pennsylvania | : | |
| Public Utility Commission, in her | : | |
| official capacity; and John F. | : | |
| Coleman, Jr., Commissioner on the | : | |
| Pennsylvania Public Utility | : | |
| Commission, in his official capacity. | : | |
| | : | |
| Defendants. | : | |
| | : | |

## VERIFIED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Middlesex Water Company ("Middlesex") returns to this Court to obtain

relief from a November 18, 2021 Order ("PUC Order") of the Pennsylvania Public

Utility Commission ("PUC") requiring Middlesex to place $1.675 million into

41277612.8

escrow as a prerequisite to the purchase, pursuant to Section 529 of the Pennsylvania Public Utility Code, of Twin Lakes Utilities, Inc. ("Twin Lakes") by Aqua Pennsylvania, Inc. ("Aqua").[1]

Middlesex originally sought injunctive relief from this Court with respect to the PUC Order in December 2021. This Court decided to abstain from hearing Middlesex's claims at that time under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Specifically, the Court wrote that its "abstention will present Pennsylvania courts with the 'opportunity to determine questions of state law **which may prevent the necessity of decision on a constitutional question.**'" *Middlesex Water Co. v. Pa. Pub. Util. Comm'n*, Docket No. 3:21-CV-1981 (M.D. Pa. Dec. 12, 2021) (Conner, J.) Memorandum Opinion (Doc. 49) at 12 (emphasis added) (quoting *Chiropractic Am. v. Lacecchia*, 180 F.3d 99, 103 (3d Cir. 1999)).

However, since this Court abstained from hearing Middlesex's claims, the Pennsylvania Commonwealth Court affirmed the PUC Order in a proceeding brought by Twin Lakes *without* ruling on whether the $1.675 million escrow requirement was an unconstitutional taking in violation of the Fifth Amendment of the Constitution of the United States.[2] Thereafter, on March 7, 2023, the

---

[1] A copy of the PUC Order is attached hereto as **Exhibit A.**

[2] A copy of the Commonwealth Court's August 11, 2022 Opinion is attached hereto as **Exhibit B.**

41277612.8

Pennsylvania Supreme Court denied Twin Lakes' Petition for Allowance of Appeal from the Commonwealth Court's affirmance of the PUC Order.[3] Thus, the Pennsylvania courts have neither considered nor determined whether the $1.675 million escrow amounts to an unconstitutional taking.[4]

Middlesex now returns to this Court to seek preliminary injunctive relief prohibiting the PUC from enforcing the PUC Order against Middlesex, specifically that portion of the Order requiring Middlesex to place funds in escrow for future infrastructure improvements. In the alternative, Middlesex seeks damages to ensure that Middlesex receives just compensation as a result of the $1.675 million taking.

Middlesex is able to return to this Court because the Court's dismissal on abstention grounds was *not* a dismissal with prejudice or a final decision on the merits. This is because the invocation of abstention doctrines constitutes a factual challenge to a court's **jurisdiction**. *Bell Atlantic-Pennsylvania, Inc. v. Pennsylvania Pub. Util. Comm'n*, 107 F. Supp. 2d 653, 659 (E.D. Pa. 2000). "A dismissal for lack of jurisdiction is plainly not a determination of the merits of a claim. Ordinarily, such a dismissal is 'without prejudice.'" *Korvettes, Inc. v. Brous*, 617 F.2d 1021, 1024 (3d Cir. 1980); *cf. Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481

---

[3] A copy of the Pennsylvania Supreme Court's Order denying Twin Lakes' Petition for Allowance of Appeal is attached hereto as **Exhibit C.**

[4] The "escrow" requirement will henceforth be referred to as a taking where applicable and appropriate.

F.3d 414, 424-25 (6th Cir. 2007) (discussing propriety of plaintiffs returning to court after *Burford* abstention "in the event the state court fails to address plaintiffs' federal claims."). Here, the Commonwealth Court has failed to address Middlesex's federal claims, and has not addressed at all the reality that the $1.675 million cannot be seen as anything other than the unconstitutional taking for which it is.

To be clear: Middlesex is **not** asking this Court to second-guess the decision of the Commonwealth Court or to rewrite Pennsylvania's public utility statutes and regulations. Instead, Middlesex is asking this Court to determine that through the PUC Order's taking of $1.675 million without providing just compensation, Middlesex's constitutional rights have been violated. Middlesex is also asking this Court, based on that determination, to put a halt to those constitutional violations, and remedy the constitutional injury suffered by Middlesex.

## INTRODUCTION

1.     Middlesex owns and operates regulated water and wastewater utility systems in New Jersey.

2.     Middlesex is a registered public utility in the State of New Jersey and is subject to regulation by the New Jersey Board of Public Utilities ("NJBPU").

3.     Since its incorporation as a water utility in 1897, Middlesex has provided a full range of regulated and non-regulated water utility, wastewater utility and related services, in New Jersey, including collecting treating, distributing and

41277612.8

selling water for domestic, commercial, municipal, industrial and fire protection purposes.

4.      Middlesex does not provide regulated or unregulated water or wastewater utility or related services in the Commonwealth of Pennsylvania nor has Middlesex ever been authorized to provide such services in the Commonwealth of Pennsylvania, despite false statements to the contrary contained in the PUC Order.

5.      Twin Lakes is a public utility corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

6.      Twin Lakes is a wholly-owned subsidiary of Middlesex.

7.      Twin Lakes provides water service to the community known as Sagamore Estates, located in Shohola Township, Pike County, Pennsylvania.

8.      On June 10, 2020, Twin Lakes issued a letter to the PUC's Bureau of Technical Utility Services ("TUS") and Bureau of Investigation Enforcement ("I&E"), as well as Pennsylvania's Office of the Consumer Advocate ("OCA"), requesting the initiation of a proceeding under Section 529 of the Pennsylvania Public Utility Code, 66 Pa. C.S.A. § 529.

9.      Under Section 529, in relevant part, the PUC "may order a capable public utility to acquire a small water or sewer utility" if certain criteria set out in the statute are met.

41277612.8

10.    As set forth in further detail, below, on November 18, 2021, the PUC issued an Order and Opinion ("PUC Order") which adopted the findings set forth in a Recommended Decision ("RD") of a Pennsylvania Administrative Law Judge ("ALJ") dated April 22, 2021, which, orders/accepts another water utility in Pennsylvania, Aqua Pennsylvania ("Aqua"), as a receiver of Twin Lakes and in pertinent part, requires Middlesex, a New Jersey corporation, to place $1.675 million into an escrow account within 30 days of the date of the issuance of the PUC Order to be used to offset the cost of Aqua replacing Twin Lakes water system infrastructure.[5]

11.    Accordingly, Middlesex files this Complaint seeking, among other remedies, a preliminary injunction against the enforcement of those provisions of the PUC Order requiring effecting the $1.675 million taking as a condition of the completion of Twin Lakes' 529 proceeding.

## JURISDICTION AND VENUE

12.    Middlesex brings this lawsuit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and alleges violations of the Fourteenth Amendment to, and the Commerce Clause of, the Constitution of the United States.

13.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, 1343, and 2201.

---

[5] A copy of the RD is attached hereto as **Exhibit D.**

41277612.8

14.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(c)(2) because (1) a substantial part of the events giving rise to the claims set forth in this Complaint occurred in this District, and (2) the PUC is subject to the Court's personal jurisdiction in this District.

## PARTIES

### *Middlesex*

15.     Middlesex is a New Jersey corporation with its principal place of business at 485C Route 1 South, Suite 400, Iselin, New Jersey 08830.

### *The PUC and the Commissioners*

16.     The PUC is an "independent administrative … commission[]" charged by statute with the regulation of public utilities in the Commonwealth of Pennsylvania. 71 Pa. C.S. § 61(a); 66 Pa. C.S. § 501(b).

17.     Gladys Brown Dutrieuille is the Chairperson of the PUC.

18.     Stephen M. DeFrank is the Vice Chairperson of the PUC.

19.     Ralph V. Yanora is a Commissioner on the PUC.

20.     Kathryn L. Zerfuss is a Commissioner on the PUC.

21.     John F. Coleman, Jr., is a Commissioner on the PUC.

22.     The PUC's principal office is located at 400 North Street, Harrisburg, Pennsylvania 17120.

41277612.8

## FACTUAL ALLEGATIONS

### The Twin Lakes System

23.    The Twin Lakes system serves approximately 114 water customers in Shohola Township, Pike County, Pennsylvania and consists of a supply of water from one functional underground well, one non-functional well, a small treatment/pumping station including an atmospheric 20,000 gallon storage tank, roughly 3.7 miles of water mains, and 120 active and inactive service connections.

24.    Before the Twin Lakes water system was acquired by Twin Lakes in 2009, it was plagued by chronic service and public health deficiencies resulting in numerous "boil water advisories" issued by the Pennsylvania Department of Environmental Protection ("PA DEP"). These problems, among others, resulted in frequent service suspensions.

### The Creation of Twin Lakes Utilities, Inc., and Acquisition of the Twin Lakes System as a Wholly-Owned Subsidiary of Middlesex

25.    On February 26, 2008, Middlesex filed a Letter Application requesting a Certificate of Public Convenience ("CPC") with the PUC with the stated goal of acquiring the assets of and operating the system of Twin Lakes Water Services, LLC ("TLWS"), the owner of the Twin Lakes water system at that time, and owning and operating such utility system through a newly created Pennsylvania water utility which would be a wholly owned subsidiary of Middlesex.

41277612.8

26.     Thereafter, on May 20, 2008, Middlesex and TLWS filed a Joint Application with the PUC seeking approval for Middlesex to acquire TWLS' assets.

27.     Both the February 26, 2008 Letter Application and May 20, 2008 Joint Application contained clear statements concerning Middlesex's intent to create a new, wholly-owned Pennsylvania subsidiary that would own and operate the assets comprising the Twin Lakes system.

28.     On February 26, 2009, the PUC issued an Order in PUC Docket Nos. A-2008-2050089 and A-2008-20500092 approving the acquisition of the Twin Lakes system.

29.     However, the PUC never issued a fully executed or valid CPC to Middlesex.

30.     Middlesex formed Twin Lakes on April 6, 2009 by filing Articles of Incorporation with the Pennsylvania Department of State Corporation Bureau.

31.     Middlesex is not now, and never was, a duly authorized Pennsylvania corporation.

32.     Thus, the creation of Twin Lakes as a wholly-owned Pennsylvania subsidiary was required to ensure that the Twin Lakes system would be operated by an entity incorporated in the Commonwealth of Pennsylvania, as first contemplated in the February 26, 2008 Letter Application.

41277612.8

33.    On November 3, 2009, Twin Lakes entered into an Asset Purchase Agreement for the Assets of TWLS, under which Twin Lakes became the owner and titleholder of TWLS' assets comprising the Twin Lakes system.

34.    Twin Lakes then filed a new tariff adopting the rules, rates, and regulations contained in TWLS' then-current tariff with the PUC on November 16, 2009.

### The True Condition of the Twin Lakes System becomes Apparent

35.    Almost immediately after Twin Lakes began operating the Twin Lakes system in November, 2009, it became clear that the system was not in the condition that the former owner had represented nor apparent based on analyses performed during a period of operational due diligence.

36.    As part of the acquisition of the Twin Lakes system, the PUC ordered the installation of water meters for each customer in this previously unmetered water system, with which Twin Lakes complied.

37.    The data collected from these meters allowed Twin Lakes to calculate the percentage of non-revenue, or unaccounted-for, water usage – a metric that was unknown by the prior owner, the PUC, or any other regulatory body.

38.    This new data indicated that the Twin Lakes system was experiencing widespread and significant leakage, the reduction of which would be a significant

financial challenge that Twin Lakes and its customers would face for the next decade.

## Middlesex's Investment in and Loans to Twin Lakes

39.     As a small stand-alone water utility, Twin Lakes faced challenges in attempting to establish any credit relationship at a reasonable cost with prospective lenders.  This difficulty was the direct result of Twin Lakes' inability to demonstrate that it possessed the requisite net income and cash flow to sustain the financial burden of operating and maintaining the Twin Lakes system in light of the required capital, operations and maintenance expenditures that would be necessary to sustain safe and reliable utility service.

40.     Starting in 2009, Middlesex, in its role as Twin Lakes' parent company, made equity investments in, and extended credit to, Twin Lakes so that Twin Lakes could maintain service for Twin Lakes' customers and finance the many necessary improvements to address the deteriorated state of the Twin Lakes system.

41.     Since 2009, Middlesex has extended financial credit to Twin Lakes through three outstanding Unsecured Revolving Promissory Notes, executed in January 2016, October 18, 2019, and October 29, 2019 (each a "Promissory Note" and collectively, the "Notes").

41277612.8

42.   Each Promissory Note provided Middlesex, as the Lender, with the right to demand payment from Twin Lakes, as Borrower, of the total amount due on the Promissory Note, along with any unpaid interest.

43.   Since the acquisition of the Twin Lakes system in 2009, Middlesex has invested, loaned, or advanced over $2.4 million to Twin Lakes.

44.   Middlesex has also supported Twin Lakes through a Service Agreement, dated December 1, 2009 ("Service Agreement"), under which Middlesex provided various types of operational support for Twin Lakes, including, but not limited to: customer service, accounting, administration, communications, corporate secretarial, engineering, financial, human resources, information systems, operations, rates and revenue, risk management, and water quality functions.

45.   Pursuant to that agreement, either Twin Lakes or Middlesex was free to terminate the Service Agreement on 90 days written notice to the other party.

## Twin Lakes' Continuous Efforts to
## Obtain Sufficient Rates to Fund Improvements

46.   Less than a year and half after the change of ownership of the Twin Lakes system, Twin Lakes understood that existing customer utility rates would not support the Twin Lakes system, nor the significant investments necessary to repair the numerous leaks and other infrastructure challenges.

47.   Twin Lakes therefore sought a series of significant rate increases through base rate cases filed with the PUC in 2011, 2015, and 2019.

48.    In June 2011, Twin Lakes sought the PUC's approval to increase rates by 370% largely driven by required significant capital investments to maintain safe and reliable utility service.

49.    At the same time, Twin Lakes commenced what has by now turned into an over ten-year endeavor to identify and institute a longer term workable solution to provide reliable, quality water service to its customers at affordable rates.

50.    In March 2012, the PUC issued an Order approving a 124.9% rate increase for Twin Lakes, to be phased in over a three-year period.  This increase was far below the relief Twin Lakes had originally requested as it deemed necessary.

51.    Nonetheless, Twin Lakes continued to make necessary improvements in the Twin Lakes system with the expectation that it would, over time, be allowed to recover through rates earn a return of and on any prudent monies invested

52.    In support of these continuous improvements and future investments, Twin Lakes again filed a base rate case with the PUC on November 11, 2015, seeking to increase rates by 257% again largely driven by the necessary investments it was making to the Twin Lakes system.

53.    On June 9, 2016, the PUC issued an Order approving a rate increase of only 164.54%, subject to two caveats.

54.     First, the rate increase was to be phased-in over a three-year period. Second, half of the rate increase (82.27%) was contingent upon the completion of future planned additional system improvements.

55.     On July 19, 2019, Twin Lakes filed another application with the PUC seeking an increase in base rates of 158.63%.

56.     However, on March 26, 2020, the PUC issued an Opinion and Order approving a rate increase of 87.91% – only 55% of what Twin Lakes had sought.

57.     As a result of the PUC's March 26, 2020 Opinion and Order, Middlesex (the sole source of financial and operational support to Twin Lakes) concluded that the PUC would not permit Twin Lakes' rates to be set at a level that would enable Twin Lakes to recover its prudently incurred costs and expenses to adequately serve its customers.

58.     The risk associated with the essential foreclosure of Twin Lakes' ability to recover its prudent costs and expenses represented an unacceptable and untenable level of risk with respect to further investment in Twin Lakes by Middlesex.

## Twin Lakes Works to Achieve a Lasting Solution to System Stability and Rate Affordability

59.     In tandem with its repeated attempts to secure rate increases from the PUC, Twin Lakes also explored other possibilities to address the necessary improvements in the Twin Lakes system while balancing the interests of customers' in keeping rates as low as possible.

14

60.    A short time after Twin Lakes filed its June 2011 base rate case, Twin Lakes' management discussed with Aqua the potential for Aqua to acquire the Twin Lakes system.

61.    Twin Lakes provided Aqua with financial records, and hosted a site inspection in November 2011, with further follow-up thereafter.

62.    Twin Lakes' management also held discussions with a representative of American Water Works Company ("American"), the parent company of Pennsylvania American Water Company ("Pennsylvania American"), concerning American's potential interest in acquiring Twin Lakes.

63.    For Pennsylvania utilities such as Pennsylvania American and Aqua, under well accepted ratemaking principles and regulatory policies , a return of and on the prudent investments in any operating system of a utility in Pennsylvania can be spread among all the Pennsylvania customers of that utility.  Such mechanisms do not flow across state lines and force customers of out of state utilities to subsidize customers of (even related) utilities in Pennsylvania.   No other state's utility commission would allow its utility customers to subsidize another state's utility customers, even if that other state's statutes permitted it.

64.    However, neither Aqua nor American were interested in acquiring the Twin Lakes system and did not pursue the matter further.

65.    In late 2014, Twin Lakes also explored the possibility of providing individual wells for each of the then 114 customers of the Twin Lakes system (as an alternative to the costly new investments needed to operate a certificated public water system).

66.    However, this solution, too, proved infeasible as a result of several of the small lot sizes in the Sagamore Estates community and applicable regulations concerning minimum clearances between septic systems and wells.

67.    Twin Lakes' senior executives also had personal meetings with the Chairman of the PUC and the OCA to explore other potential solutions, but these discussions did not yield the relief necessary to enable Twin Lakes to balance the ability to make the necessary improvements in its system without significantly increasing rates.

**The PUC Summarily Rejects Twin Lakes' Petition for Abandonment and Twin Lakes continues to pursue Additional Alternatives**

68.    On February 26, 2018, Twin Lakes issued a letter to TUS, I&E, OCA, and the Office of Small Business Advocate ("OSBA") advising that there was an emergent need for Twin Lakes to undertake extensive system improvements that would raise Twin Lakes customers' water bills above $4,000 annually.

69.    In the February 26, 2018 letter, Twin Lakes outlined three potential options concerning how it could realistically proceed: (1) file a petition for abandonment of the Twin Lakes system franchise under the Pennsylvania Public

41277612.8

Utility Code; (2) file for emergent rate relief; or (3) identify a larger investor-owned water utility that was able to make and be authorized to earn a return of and on the necessary improvements to the Twin Lakes system.

70.    On October 23, 2018, Twin Lakes filed a Petition for Abandonment with the PUC.

71.    The PUC summarily rejected Twin Lakes' Petition for Abandonment just two (2) days later, on October 25, 2018.

72.    Twin Lakes, however, continued to investigate alternative opportunities that would allow the Twin Lakes system to remain viable without significantly increasing rates.

73.    Twin Lakes applied for and was authorized to receive a PENNVEST grant in the amount of $4.66 million to finance the five-year capital improvement plan that had been submitted in Twin Lakes' prior rate cases.

74.    However, the PENNVEST grant turned out not to be the lifeboat intended, as pursuant to the changed tax laws in the Tax Cuts and Jobs Act of 2017 ("TCJA"), the grant (considered a Contribution In Aid of Construction ("CIAC") to Twin Lakes) was subject to federal income tax (which would also have had to be paid through rates by the 114 current customers of Twin Lakes).

75.    Thus, the PENNVEST grant of $4.66 million would carry an income tax liability of $1.358 million – all of which would need to be recoverable from Twin Lakes' customers.

76.    Because of the PUC's decisions in Twin Lakes' prior rate cases, Middlesex concluded that the income tax liability on the PENNVEST grant would significantly increase customer rates and, therefore, based on the history of rate applications for Twin Lakes, would likely not be approved for rate recovery by the PUC, leaving Twin Lakes without any way to recover the tax liability.

77.    The likelihood that Twin Lakes would not be able to recover the PENNVEST grant's income tax liability in rates would only add to the financial difficulties faced by Twin Lakes and, as a result, Twin Lakes did not formally accept the PENNVEST grant.

78.    Twin Lakes also explored solutions with another Pennsylvania water purveyor, Utilities, Inc., as well as explored the potential to interconnect with the nearest public water system, Milford Township.

79.    Unfortunately, neither of these avenues bore fruit, either.  Utilities, Inc. had no interest in pursuing a transaction involving the Twin Lakes system, and the interconnection with Milford Township was deemed impractical because of the serious logistical and geographical challenges associated with such an interconnection over the mountainous terrain between the systems.

41277612.8

### **Middlesex Makes a Payment Demand on the Balance of the Notes**

80.     On May 28, 2020, Middlesex, as Lender, issued a letter to Twin Lakes, as Borrower, demanding immediate payment of the total outstanding (and overdue) amounts due on the Notes.

81.     The next day, on May 29, 2020, Twin Lakes responded via letter, stating that it could not meet Middlesex's payment demand and that it did not expect to be able to satisfy any of its repayment obligations of the outstanding Notes.

82.     Middlesex therefore ceased providing financial support to Twin Lakes, effective May 28, 2020, the date Middlesex tendered its demand for payment on the three outstanding Notes.

83.     Since May 28, 2020, Twin Lakes has been unable to establish an independent credit relationship with a financial institution.

84.     On June 1, 2020, Middlesex issued a letter notice of termination of the Service Agreement between Middlesex and Twin Lakes, effective as of September 1, 2020 (the 90 days' notice required under the approved terms of the Service Agreement).

41277612.8

## **Twin Lakes Initiates a Section 529 Proceeding**

85.    Twin Lakes issued a letter to TUS, I&E, and OCA on June 10, 2020, advising of Middlesex's cessation of financial support and the termination of the Services Agreement.

86.    In the June 10, 2020 letter, Twin Lakes requested the PUC's initiation of a proceeding under Section 529 ("529 Proceeding") of the Pennsylvania Public Utility Code, 66 Pa. C.S.A. § 529.

87.    Section 529 is titled "Power of PUC to order acquisition of small water and sewer utilities" and provides, in relevant part, that "[t]he PUC may order a capable public utility to acquire a small water or sewer utility" if certain conditions exist.  66 Pa. C.S.A. § 529(a).

88.    While the PUC initially accepted the June 10, 2020 letter, the PUC subsequently required Twin Lakes to file a Petition requesting relief under Section 529 to initiate the proceeding.

89.    Twin Lakes filed that Petition ("Section 529 Petition") on July 16, 2020.

90.    Following the filing of the 529 Petition, the OCA filed a petition for issuance of an interim emergency order on an interim basis seeking the appointment of a receiver for the Twin Lakes system in the event that Twin Lakes was unable to

secure a new system operator by the September 1, 2020 deadline of Middlesex's termination of the Service Agreement.

91.    The OCA's Petition, filed on August 18, 2020, specifically noted that "**Twin Lakes** has an ongoing obligation, **pursuant to its certificate of public convenience**, to provide service to its customers until the resolution of the Section 529 proceeding and/or until the Commission otherwise approves an abandonment of service." (Emphasis added).

92.    On August 28, 2020, the ALJ issued an order denying the OCA's Petition.

93.    In the August 28, 2020 order, the ALJ noted, in relevant part, that "Twin lakes is a certified public utility in Pennsylvania and has an obligation to provide service pursuant to **its** certificate of public convenience until the Commission directs otherwise." (Emphasis added).

94.    The ALJ therefore ordered, in relevant part, that "Twin Lakes Utilities, Inc. is prohibited from terminating water utility service pursuant to its Commission approved certificate of public convenience until otherwise directed by the Commission."

95.    Ultimately, on September 17, 2020, the PUC entered an Opinion and Order that, among other things, instituted a Section 529 investigation to determine whether it should order the acquisition of the Twin Lakes system by a capable

Pennsylvania public utility.   The matter was remanded to the Office of Administrative Law Judge for further proceedings.

96.    Tellingly, in its September 17, 2020 Order, the PUC answered the question of whether it should "permit a **certificated small water or wastewater public utility** to proceed by its own petition pursuant to 66 P.A. C.S. § 529 of the Public Utility Code[.]" (Emphasis added).

97.    The "certificated small water or wastewater public utility" to which the PUC referred was Twin Lakes.

98.    Thereafter, on September 22, 2020, the PUC further ordered that Aqua conduct due diligence as to whether it would voluntarily act as a receiver of the Twin Lakes system.

99.    In the September 22, 2020 Order, the PUC explained that "[t]here is no dispute here about the legal requirements imposed on Twin Lakes as a Pennsylvania certificated public utility."

100.   The September 22, 2020 Order commanded, in relevant part, that "Twin Lakes Utilities, Inc., is prohibited from terminating water utility service **pursuant to its Commission approved certificate of public convenience** until otherwise directed by the Commission." (Emphasis added).

101.   Aqua submitted a letter on December 16, 2020 indicating that it would voluntarily act as a receiver of the Twin Lakes system effective January 4, 2021

41277612.8

during the pendency of the Section 529 proceeding.  The January 4, 2021 date was later revised to January 15, 2021, to permit the PUC to act on Aqua's request during its next public meeting.

102.   The evidentiary hearings in the Section 529 proceeding were held on January 5, 2021 before an ALJ.

103.   On January 14, 2021, the PUC issued an Order approving the appointment of Aqua as a receiver of the Twin Lakes system, effective January 15, 2021.  The next day, January 15, 2021, Aqua assumed receivership of the Twin Lakes system pursuant to the PUC's Order from the previous day.

## The ALJ'S Decision in the Section 529 Proceeding

104.   On April 22, 2021, the ALJ issued the RD in the Section 529 Proceeding.

105.   In relevant part, the RD concluded "that a petition filed by a small water utility seeking an order from the Commission directing a capable water utility to acquire the small water utility because all of the necessary statutory requirements have been met should be granted." RD at p. 1.

106.   The RD further noted that "the small water utility cannot reasonably be expected to furnish and maintain adequate, efficient, safe and reasonable service and facilities in the future and that the alternatives to acquisition have been considered and determined to be impractical or not economically feasible." *Id.*

107. Despite these conclusions, the RD "conditioned [the statutory acquisition] upon the parent company of the small water utility placing into escrow $1,675,000 to be used to offset the costs of replacing and remediating the existing infrastructure." *Id.*

108. Specifically, the RD concluded that the PUC possessed jurisdiction over Middlesex, despite the fact that the Twin Lakes system was owned and operated by Twin Lakes, because Middlesex "was the original filer of the letter of intent in 2008 when it sought to acquire Twin Lakes" and "without Middlesex's financial and operational support, Twin Lakes could not provide water utility services to its customers." RD at p. 31.

109. The RD further noted that "Middlesex has a controlling interest in Twin lakes with exclusive voting rights. Executives of Twin Lakes are executives of Middlesex." *Id.*

110. The RD finally stated that:

> All of these factors warrant finding that the Commission has jurisdiction over Middlesex for the purposes of this proceeding and that Middlesex must be considered as the corporate parent when evaluating Twin Lakes under Section 529. Middlesex cannot come into Pennsylvania to purchase Twin Lakes, provide service to Pennsylvania customers, seek rate increases from the Pennsylvania Commission, and more, and then not be considered as the corporate parent when Twin Lakes files for an investigation under Section 529.

*Id.* at pp. 31-32.

111.    The RD's conclusions that the PUC had jurisdiction over Middlesex ignored the facts that:

- Twin Lakes is the owner and titleholder of the Twin Lakes system and associated assets;

- Twin Lakes is the entity that filed the Articles of Incorporation and is registered to do business in Pennsylvania with the Pennsylvania Department of State Corporations Bureau;

- Twin Lakes is the entity that filed a tariff that was accepted by the PUC in 2009 and under which service is provided by Twin Lakes to its customers;

- Twin Lakes is the entity that filed for and received rate increases from the PUC in 2011, 2015, and 2019;

- Middlesex is not, and has never been recognized as a legal entity authorized to do business in the Commonwealth of Pennsylvania; and

- The PUC never issued a valid or fully executed CPC to Middlesex.

112.    The RD also recommended that it was "reasonable to condition the approval of Twin Lakes' petition on Middlesex placing $1.675 million into an escrow account to be used to offset the costs of replacing and remediating the existing infrastructure so that just and reasonable service can be provided[.]" RD at p. 57.

113.    The RD distilled its rationale for the escrow requirement as follows:

> Had Middlesex been making the necessary improvements
> to the Twin Lakes system as it should have been during
> the past decade, it would not be required to place

$1,675,000 into escrow as a condition of the approval of the Section 529 petition, as is the case now. Middlesex has not made such improvements and therefore must pay as such now.

*Id.* at p. 58.

114.   Not only did this recommendation ignore the fact that Middlesex has invested, loaned, or advanced over $2.4 million to Twin Lakes since 2009 for which it has not seen a penny in return, but also ignored the central and determinative fact that Middlesex was never (and could not have been) required to make improvements to the Twin Lakes system, as it has never been the owner of the assets of Twin Lakes, and the PUC has never had the legal or regulatory jurisdiction or authority to mandate that it do so.

115.   Indeed, in the 10 plus years that Twin Lakes has owned the Twin Lakes system, until now, not once has the PUC entered an order or otherwise sought to mandate that Middlesex, rather than Twin Lakes, take any action related to the Twin Lakes system – because it did not, and does not now, have the authority to require a utility outside of its jurisdiction to take any action.

116.   The RD did **not** cite 66 Pa. C.S. § 1103, the relevant statutory provision concerning the issuance of a CPC or otherwise discuss how or whether it was appropriate to amend, modify, or alter the conditions of the CPC that was never issued to Middlesex or Twin Lakes.

117.   The RD further ordered Aqua and Twin Lakes to "engage in good-faith, arms-length negotiations regarding the sale price of the Twin Lakes system to Aqua Pennsylvania, Inc., subject to the Commission's approval." RD at p. 70, ¶ 3.

118.   Twin Lakes, as permitted under the applicable provisions of the Pennsylvania Public Utility Code, filed exceptions to certain portions of the RD.

## The PUC's Adoption of the ALJ's Decision
## in the Section 529 Proceeding

119.   On November 18, 2021, the PUC issued the PUC Order adopting the ALJ's RD with modification.

120.   In relevant part, the PUC agreed with the ALJ's conclusion that "for purposes of the Commission's jurisdiction, Twin Lakes and Middlesex are one in the same, per the ALJ's analysis of an 'alter ego' status." PUC Order, p. 37.

121.   The PUC sought to clarify the ALJ's basis for the exercise of jurisdiction over Middlesex.

122.   For example, the PUC noted that "the appearance in this Section 529 proceeding as witnesses by corporate officers of Middlesex, may itself constitute consent to Commission jurisdiction." PUC Order, p. 39.

123.   However, the PUC failed to acknowledge that those witnesses did *not* appear in their capacity as corporate officers of Middlesex. Instead, they appeared in their capacity as corporate officers of Twin Lakes.

124.   Ultimately, the PUC concluded that "the facts establish that Middlesex sought and was granted a CPC, and assumed the rights and duties thereunder, for the privilege of doing business within the Commonwealth to provide water service within the delineated service territory." PUC Order, p. 40.

125.   However, as noted above, at all relevant times during the 529 Proceeding, the ALJ **and** the PUC referred to ***Twin Lakes*** as the certificated water utility.

126.   Further, the evidence of record in the 529 Proceeding demonstrated that Middlesex was never issued a fully executed or valid CPC.

127.   Despite this, the PUC continually referred to Middlesex as the holder of a CPC, PUC Order, p. 41, even though its prior orders expressly commanded that **"Twin Lakes Utilities, Inc., is prohibited from terminating water utility service pursuant to its Commission approved certificate of public convenience** until otherwise directed by the Commission." (Emphasis added).

128.   The PUC Order did not cite 66 Pa. C.S. § 1103, the relevant statutory provision concerning the issuance of a CPC or otherwise discuss how or whether it was appropriate to amend, modify, or alter the conditions of the CPC that was never issued to Middlesex or Twin Lakes.

41277612.8

129.   Neither the RD nor the PUC Order contained any salient analysis concerning the proper application of the "alter ego" theory or piercing the corporate veil.

130.   These omissions were even despite the fact that there is a strong presumption in the Commonwealth against piercing the corporate veil. *Lumax Indus., Inc. v. Aultman*, 543 Pa. 38-41-43 (1995) (citation omitted).

131.   The PUC went so far as to conclude that "the creation of Middlesex's wholly owned Pennsylvania subsidiary, Twin Lakes, in April 2009 created the Pennsylvania alter ego of Middlesex." PUC Order, p. 51.

132.   However, such rationale turns the idea of corporate separateness on its head. *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 317 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012) ("When a subsidiary of a foreign corporation is carrying on business in a particular jurisdiction, the parent company is not automatically subject to jurisdiction in that state because of the presumption of corporate separateness.").

**Twin Lakes' Action before the Pennsylvania Commonwealth Court**

133.   Twin Lakes filed a Petition for Review of the PUC Order with the Pennsylvania Commonwealth Court on November 22, 2021.

134.   Aqua intervened in that matter on December 6, 2021.

135. Twin Lakes filed an Emergency Application for a Partial Stay of the PUC Order pending Appeal on December 6, 2021.

136. The Commonwealth Court granted Twin Lakes' request for a partial stay on December 23, 2021.

137. The matter was briefed and oral argument occurred on May 16, 2022.

138. The Commonwealth Court issued an opinion on August 11, 2022, in which it affirmed the PUC Order in its entirety. *See* **Exhibit B.**

139. The Commonwealth Court first concluded that Middlesex was **not** the "alter ego" of Twin Lakes for all purposes. **Exhibit B** at pp. 10-11.

140. Despite this conclusion, the Commonwealth Court found that the PUC properly imposed the $1.675 million escrow requirement as a condition of the Section 529 Proceeding. *Id.* at pp. 16-21.

141. The Commonwealth Court conceded that Section 529 permitted the PUC "to approve or disapprove the negotiated price reached by the parties to a Section 529 acquisition, **but it does not specifically authorize the PUC to impose conditions precedent to the negotiation and determination of that price or to impose an exit fee.**" *Id.* at p. 17 (emphasis added) (citing 66 Pa. C.S. § 529(e)).

142. Instead, the Commonwealth Court cited Section 1103(a) of the Public Utility Code, which provides as follows:

> General rule. Every application for a certificate of public convenience shall be made to the Commission in writing, be verified by oath or

30

affirmation, and be in such form, and contain such information, as the Commission may require by its regulations. A certificate of public convenience shall be granted by order of the Commission, only if the Commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public. *The Commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable.* In every case, the Commission shall make a finding or determination in writing, stating whether or not its approval is granted. Any holder of a certificate of public convenience, exercising the authority conferred by such certificate, shall be deemed to have waived any and all objections to the terms and conditions of such certificate.

*Id.* at p. 17 (citing 66 Pa. C.S. § 1103(a) (emphasis added by Commonwealth Court).

143.    The Commonwealth Court reasoned that the PUC treated Twin Lakes' Section 529 Petition "as involving both Section 1103(a) and Section 529(e) of the Public Utility Code. It imposed the condition of the escrow fund under authority of Section 1103(a), which authorizes the PUC to 'impose such conditions as it may deem to be just and reasonable' upon a utility's certificate of public convenience." **Exhibit B** at p. 18 (citing 66 Pa. C.S. § 1103(a).

144.    The Commonwealth Court reasoned that PUC Order "clarified that Middlesex was a certificated public utility and imposed a condition on that certificate, in the form of an escrow of $1.675 million." *Id.* at 18.

145.    The Commonwealth Court then stated that the PUC was permitted to modify its March 2009 order "to impose reasonable and just conditions upon the license sought and required by Middlesex" under 66 Pa. C.S. § 501(a) and (b), which,

41277612.8

in relevant part, give the PUC the "power to rescind or modify" its "regulations or orders." *Id.* at pp. 18-19.

146.   The Commonwealth Court did not provide any examples of an instance in which the PUC modified one of its prior orders, or a CPC, to require a public utility to deposit funds in escrow or otherwise use its own money to fund the repair of a utility system it would no longer own, and could therefore not earn a return of and on its investments. Put another way, the Commonwealth Court did not provide any examples of an instance in which the PUC ordered a constitutional taking to fund repairs of a utility system it would no longer own and be unable in law and fact to recover any monies invested or spent.

147.   Finally, without more, the Commonwealth Court "reject[ed] the contention that Middlesex was denied due process." *Id.* at p. 20.

148.   Without citing case law or any evidence of record, the Commonwealth Court concluded that "Middlesex chose to offer water service in Pennsylvania through a subsidiary and then, as manager of that subsidiary, directed it to file the Section 529 petition." *Id.*

149.   The Commonwealth Court further stated that Middlesex was "not a passive investor. It participated in the Section 529 proceeding, both before the PUC and this Court, vigorously challenging the escrow condition. Middlesex effectively

initiated the instant Section 529 proceeding, which fully comported with due process." *Id.*

150. The Commonwealth Court therefore concluded that the escrow requirement was permissible because "Middlesex, on its own volition, entered the Pennsylvania utility marketplace, thereby subjecting itself to the PUC's jurisdiction." *Id.* Because Middlesex "was the only corporation entity authorized to offer water service in Pennsylvania, which required a certificate of public convenience" Middlesex had "waived any and all objections to the terms and conditions" of that certificate, "including the requirement that it escrow $1.675 million. *Id.* (citing 66 Pa. C.S. § 1103(a)).

151. Twin Lakes filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court on September 9, 2022.

152. The Pennsylvania Supreme Court denied Twin Lakes' Petition for Allowance of Appeal on March 7, 2023. *See* **Exhibit C.**

### Middlesex's Request for Injunctive Relief before this Court

153. Middlesex filed a Complaint for Preliminary and Injunctive Relief in this Court on November 19, 2021. *See Middlesex Water Co. v. Pennsylvania Public Utility Comm'n*, 3:21-CV-01981 (M.D. Pa. Nov. 19, 2021).

154. Middlesex then filed an Emergency Motion for Preliminary Injunctive Relief on November 29, 2021.

41277612.8

155.   Aqua filed a motion to intervene on December 6, 2021, and the motion was granted on the same day.

156.    The Court held a hearing on Middlesex's request for an injunction on December 10, 2021.

157.   On December 16, 2021, the Court issued an order dismissing Middlesex's complaint and denying Middlesex's request for injunctive relief.

158.   This Court's decision was based on the *Burford* abstention doctrine and the belief that "[o]ur exercise of jurisdiction would interfere with the Commonwealth Court, which has a pending, emergency stay petition from Twin Lakes." *Middlesex Water Co. v. Pa. Pub. Util. Comm'n*, Docket No. 3:21-CV-1981 (M.D. Pa. Dec. 12, 2021) (Conner, J.) Memorandum Opinion (Doc. 49) at 15-16.

## COUNT ONE
### U.S. Const. Amend. XIV, Substantive Due Process
### 42 U.S.C. § 1983

159.   Middlesex re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint, as if fully set forth herein.

160.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution safeguards a person's right to pursue legitimate business interests free from interference except for regulations that are rationally related to a legitimate government purpose.

41277612.8

161.   The Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.").

162.   The PUC Order violates Middlesex's right to due process under the Fourteenth Amendment to the U.S. Constitution.

163.   First, the PUC's Order concerning the escrow requirement represents an impermissible exercise of personal jurisdiction by the PUC over Middlesex. The Order violates Middlesex's liberty interest "in not being subject to the binding judgments of a forum with which [Middlesex] has established no meaningful 'contacts, ties, or relations.'"   *Burger King*, 471 U.S. at 471-72 (quoting *Int'l Shoe*, 326 U.S. at 319).

164.   In concluding that it could exercise personal jurisdiction over Middlesex, the PUC ignored the corporate form between Middlesex and Twin Lakes and, in so doing, violated the Due Process Clause of the Fourteenth Amendment. *See Daimler AG v. Bauman*, 571 U.S. 117, 137-138 (2014).

41277612.8

165.   The Commonwealth Court **confirmed** that Middlesex, as corporate parent, was **not** "the corporate 'alter ego' of Twin Lakes," Middlesex's subsidiary, "for all purposes." **Exhibit B** at 11.

166.   Despite this, the Commonwealth Court agreed that the PUC could force Middlesex, the corporate parent, to pay $1.675 million to secure approval for Twin Lakes, the subsidiary's, Section 529 petition.

167.   The $1.675 million taking violates well-settled due process precepts. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 134 (2014) (rejecting the notion that 'a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary.'").

168.   The $1.675 million taking is predicated upon a shifting rationale for so-called "jurisdiction" over Middlesex. First, the RD and PUC Order declared that Twin Lakes was the "alter ego" of Middlesex. Once that theory became untenable, the PUC – for the first time on appeal – suggested that it had the retroactive power to amend a CPC that it had never previously issued to impose the $1.675 million taking as a "condition" related to the illusory CPC, rather than as a condition of the Section 529 proceeding.

169.   Second, mandating that Middlesex place $1.675 million into escrow as a prerequisite to the completion of the Twin Lakes Section 529 proceeding is not rationally related to achieving any legitimate government purpose.

41277612.8

170.   This is so because under the applicable statute, the PUC has no role in the negotiations between the small water company and its acquirer other than an ultimate determination of whether the price is "reasonable."

171.   Indeed, the statute provides, in relevant part, that "[t]he price for the acquisition of the small water or sewer utility shall be determined by agreement between the small water or sewer utility and the acquiring capable public utility, subject to a determination by the commission that the price is reasonable." 66 Pa. C.S. § 529(e).

172.   In the event that the small water utility and the acquiring utility are unable to agree on an acquisition price, or the PUC disapproves the acquisition price on which the negotiating parties have agreed, "the commission shall issue an order directing the acquiring public utility to acquire the small water or sewer utility by following the procedure prescribed for exercising the power of eminent domain pursuant to the … Eminent Domain Code." 66 Pa. C.S.A. § 529(e).

173.   Instead, as applied to Middlesex, the escrow requirement is an unconstitutional and punitive penalty designed to deter out-of-state actors from investing in public utilities operating in the Commonwealth of Pennsylvania. Indeed, the PUC has never imposed such a requirement on an in-state investor of a Pennsylvania public utility.

41277612.8

174.   Unless the PUC is enjoined from violating the Fourteenth Amendment, Middlesex will continue to suffer great and irreparable harm.

**COUNT TWO**
**U.S. Const. Amend. XIV, Procedural Due Process**
**42 U.S.C. § 1983**

175.   Middlesex re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint, as if fully set forth herein.

176.   Middlesex did not initiate the Section 529 Proceeding or file the 529 Petition with the PUC.

177.   Middlesex was not a party to the Section 529 Proceeding before the PUC.

178.   Middlesex did not file, nor was Middlesex ever joined as a party to (and did not intervene in) any of Twin Lakes' prior base rate filings before the PUC.

179.   Despite these facts, the PUC Order concluded that Middlesex had "notice" of its potential involvement in the Section 529 Proceeding and an opportunity to be heard because certain of Twin Lakes' witnesses during the Section 529 Proceeding were corporate officers for both Twin Lakes and Middlesex.

180.   The PUC Order further claimed that Middlesex had notice because it was a "respondent" in certain filings made by Twin Lakes concerning promissory agreements. However, Middlesex did not file any documents in those proceedings,

41277612.8

nor did Middlesex participate in those proceedings, nor was Middlesex a statutory or necessary party in those proceedings.

181.   Nonetheless, Middlesex was never formally put on notice by the PUC that it intended to exercise jurisdiction over Middlesex in the Section 529 Proceeding, or in any other of Twin Lakes' matters previously before the PUC. Middlesex, therefore, was not provided with notice and an opportunity to be heard.

182.   The Commonwealth Court, without citing the record, echoed the conclusions in the PUC Order as to whether Middlesex was afforded due process. *See* **Exhibit B** at p. 20.

183.   Finally, the Commonwealth Court held that "the PUC treated Twin Lakes' petition as involving both Section 1103(a) and Section 529(e) of the Public Utility Code." *Id.* at p. 18.

184.   Section 1103(a) of the Public Utility Code concerns the PUC's authority to grant CPCs. 66 Pa. C.S. § 1103(a).

185.   But, the RD treated Twin Lakes' petition only as a petition under Section 529(e). RD at p. 1.

186.   Similarly, the PUC Order never treated Twin Lakes' petition as concerning Section 1103(a). Instead, the PUC Order recognized only that the proceeding was "related to Twin Lakes' Petition for a Commission order authorizing

the acquisition of Twin Lakes by a capable public utility pursuant to Section 529 …

of the Public Utility Code[.]" **Exhibit A** at p. 3.

187.   The PUC Order repeatedly referred to the proceeding as "this Section

529 proceeding." **Exhibit A** at p. 39.

188.   No notice was ever provided to Middlesex – or Twin Lakes – that the

Section 529 proceeding would be "treated" as a proceeding under Section 1103(a).

189.   The Commonwealth Court also stated that the PUC had "authority to

modify its March 2009 order" that granted Middlesex a CPC. **Exhibit B** at p. 20.

190.   No notice was ever provided to Middlesex – or Twin Lakes – that the

Section 529 proceeding would be "treated" as a proceeding to modify or amend the

CPC that had supposedly been issued to Middlesex.

191.   Proceedings to amend or modify CPCs are typically filed by the holder

of the CPC. *See Glenside Sub. Radio Cab, Inc. v. Pa. Pub. Util. Comm'n*, 411 A.2d

874, 875 (Pa. Cmwlth. 1980).

192.   Instead, Middlesex was informed – for the first time – via the

Commonwealth Court's decision that the PUC had "treated" Twin Lakes' petition

as a proceeding under Section 1103(a) relating to CPCs *in addition* to  a proceeding

under Section 529(e) – the provision that Twin Lakes filed its petition under.

193.   Thus, Middlesex never had notice that a Section 529(e) proceeding filed

on July 16, 2020 by its subsidiary Twin Lakes could potentially impact a CPC that

was supposedly granted in 2009 – some 11 years before, under Section 1103(a), Section 501(a), or any other section of the Public Utility Code.

194.   The justification and basis for the PUC Order has continually shifted.

195.   First, Middlesex was supposedly afforded due process because it was the "alter ego" of Twin Lakes.

196.   Now, Middlesex was supposedly afforded due process predicated on the assumption that the PUC had authority to amend a CPC from 2009 that was never issued to Middlesex to impose a condition that Middlesex deposit $1.675 million in escrow as a condition for its in-state subsidiary receive relief under Section 529 of the Public Utility Code.

197.   This twisted logic would permit the PUC to retroactively amend *any* CPC issued to *any* public utility in the Commonwealth to require it to take any action as a "condition" of its CPC when, in truth, the condition actually relates to some other legitimate request; in this case, Twin Lakes' Section 529 petition.

198.   Unless the PUC is enjoined from violating the Fourteenth Amendment, Middlesex will continue to suffer great and irreparable harm.

41277612.8

## COUNT THREE
**U.S. Const. Amend. XIV, Equal Protection**
**42 U.S.C. § 1983**

199.   Middlesex re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint, as if fully set forth herein.

200.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the PUC from making arbitrary and unreasonable classifications.  A state actor violates the Equal Protection Clause when it provides disparate treatment to one person over another, despite the fact that those two persons are similarly situated and there is otherwise no rational basis for the disparate treatment. *See, e.g.*, *Williams v. Vermont*, 472 U.S. 14, 27 (1985).

201.  Here, the PUC Order's requirement that Middlesex place $1.675 million in escrow as a condition of consummation of the Section 529 Proceeding for Twin Lakes constitutes disparate treatment without a legitimate justification between small water companies with a corporate parent and small water companies without a corporate parent.

202.   These irrational classifications do not further a legitimate governmental interest and were drawn only to punish Middlesex and arguably to safeguard Pennsylvania public utilities from out-of-state economic competitors.  Neither of these reasons represents a legitimate governmental purpose.

41277612.8

203.   Further, the irrational classification results in an impermissible violation of Middlesex's fundamental right to just compensation in connection with a taking of private property for a public purpose. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *McCoy v. Union Elevated R. Co.*, 247 U.S. 354, 364 (1918) (discussing property "owner's fundamental right to just compensation" for government taking)

204.   Unless the PUC is enjoined from violating the Fourteenth Amendment, Middlesex will continue to suffer great and irreparable harm.

### COUNT FOUR
### U.S. Const. art. I, Dormant Commerce Clause
### 42 U.S.C. § 1983

205.   Middlesex re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

206.   Congress is authorized under the United States Constitution "[t]o regulate Commerce … among the several States."  U.S. Const. art. I, § 8, cl. 3.

207.   The Commerce Clause also acts in the opposite direction, which prohibits state and local governments from interfering with the free flow of goods and services from one state to another.  This is known as the dormant Commerce Clause.  *See, e.g.*, *Camps Newfoundland/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 575-76 (1997).

43

41277612.8

208.   The dormant Commerce Clause forbids states from engaging in economic protectionism in favor of in-state economic interests by hindering or punishing out-of-state competitors. *Id*. at 577-78.

209.   As applied to Middlesex, the PUC Order, violates the dormant Commerce Clause because it punishes Middlesex – an out-of-state corporation – by taking $1.675 million of Middlesex's capital to consummate the sale of Twin Lakes, a Pennsylvania regulated utility and small water company, to another Pennsylvania public utility.

210.   The $1.675 million taking is not found in the applicable statutory provision, 66 Pa. C.S.A. § 529, and has never been applied in another Section 529 proceeding.

211.   In that respect, the PUC can no more require Middlesex to deposit an escrow as a condition of the Twin Lakes 529 Proceeding than it could require the individual owner of a small water company to post an individual bond in his or her own name as a condition of a 529 proceeding.

212.   The $1.675 million taking also violates the dormant Commerce Clause because it is excessive in relation to any possible local benefit.  It imposes an undue burden on interstate commerce, unfairly penalizes Middlesex, and violates Middlesex's due process rights.  As noted above, the only "benefit" of the $1.675

million taking is economic protection for Pennsylvania public utilities and a windfall for any new owner of the Twin Lakes system.

213.   Further, the $1.675 million taking will impede the flow into the Commonwealth of Pennsylvania of financial and operational support for public utilities operating in Pennsylvania from out-of-state entities, whether they are public utilities or not.  Indeed, such overreach by the PUC, as has occurred here, would certainly dissuade any out-of-state investors from investing in small Pennsylvania public utilities.

214.  The Supreme Court has explained that "the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," and the essential question is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989); *see also Old Bridge Chems., Inc. v. New Jersey Dep't of Envtl. Prot.*, 965 F.2d 1287, 1293 (3d Cir.) ("The Supreme Court has invalidated state statutes where a state has 'projected' its legislation into other states and directly regulated commerce therein, thereby either forcing individuals to abandon commerce in other states or forcing other states to alter their regulations to conform with the conflicting legislation."), *cert. denied*, 506 U.S. 1000 (1992).

215.   The $1.675 million taking will be used by Twin Lakes (in reality the funds will be used by Aqua in its role as receiver and, eventually, owner) – a Pennsylvania public utility – to "offset the costs of replacing and remediating the existing infrastructure" of the System. RD at p. 63.

216.   But Middlesex is a New Jersey corporation that is registered as a public utility in the State of New Jersey and, therefore, subject to regulation by the New Jersey Board of Public Utilities ("NJBPU"), and not the PUC.

217.   Middlesex does not provide regulated or unregulated water or wastewater utility or related services in the Commonwealth of Pennsylvania and is not a "public utility" regulated by the PUC.

218.   In fact, on the PUC's website, the PUC lists "water utilities" under its jurisdiction.[6] Middlesex is not listed.

219.   Thus, by requiring Middlesex, a New Jersey public utility, to fund improvements for Aqua, a Pennsylvania public utility, the PUC is requiring an out-of-state public utility to subsidize rate base improvements for an in-state public utility and its ratepayers.[7] This has the impermissible result of placing the burden of

---

[6]   Pennsylvania Public Utility Commission, "Water Utilities." Available at: https://www.puc.pa.gov/water-wastewater/water-utilities/ (last accessed March 10, 2023).

[7]   A brief overview of utility ratemaking is illustrative. "Generally, the rate base is comprised of total capital invested in facilities minus depreciation plus cash working capital. The rate of return, on the other hand, is a weighted average of different rates

Pennsylvania regulation on interests outside of Pennsylvania – namely Middlesex's capital. *See Southern Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 767 n. 2 (1945).

220.    In other words, the PUC purports to regulate a New Jersey public utility, even though that public utility will *never* be able to seek rate relief from the PUC, and thus never have an opportunity to recover any return of or on any investments made in a utility in Pennsylvania.

221.    The Commonwealth Court did not address whether the escrow requirement violates the dormant Commerce Clause.

222.    Unless the PUC is enjoined from violating the dormant Commerce Clause, Middlesex will continue to suffer great and irreparable harm.

**COUNT FIVE**
**U.S. Const., amend. V, amend. XIV**
**42 U.S.C. § 1983**

223.    Middlesex re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

---

applied to debt, preferred stock and common stock." *Jersey Cent. Power & Light Co. v. F.E.R.C.*, 810 F.2d 1168, 1203 (D.C. Cir. 1987) (en banc) (Mikva, J., dissenting). "Calculation of rate base is a critical step in establishing maximum rates, since the product of rate base multiplied by allowed rate of return is the total sum of money the agency allows to investors in the firm." *United Distribution Companies v. F.E.R.C.*, 88 F.3d 1105, 1179 (D.C. Cir. 1996) (quotation and citation omitted).

224.   The Fifth Amendment to the United States Constitution provides, in relevant part: "nor shall private property be taken for public use without just compensation." U.S. Const., amend. V.   This language is known as the Takings Clause.

225.   The Supreme Court of the United States has incorporated the Takings Clause through the Due Process Clause of the Fourteenth Amendment to apply to the states.

226.   The United States Supreme Court has held that a state may not compel a public utility to use its property for the benefit of the public without receiving just compensation.  *See, e.g.*, *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989); *cf. U.S. Steel Corp. v. Pa. Pub. Util. Comm'n*, 390 A.2d 865, 871 (Pa. Cmwlth. 1978) (utility cannot be required to provide "subsidy out of its capital.").

227.   Public utilities are entitled to earn a reasonable return on the fair value of their property at the time it is being used for public service.  *See, e.g.*, *Barasch*, 488 U.S. at 307.

228.   As applied to Middlesex, the requirement that Middlesex deposit $1.675 million in escrow to finance repairs to the Twin Lakes system that it does not own is a taking without just compensation.

229.   Indeed, because Middlesex does not own the Twin Lakes system, it will never have a chance to earn *any* return, let alone a reasonable return, on the property

41277612.8

that will eventually become used and useful in the public service provided by Aqua as a result of the $1.675 million that is being taken from Middlesex.

230.   Accordingly, the escrow requirement is an unconstitutional taking because Middlesex will never have the opportunity to earn a reasonable return on some or all of the $1.675 million used to repair the Twin Lakes system.

231.   "If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Barasch*, 488 U.S. at 308.

232.   The Commonwealth Court **did not address** the argument that the so-called "escrow" is actually an unconstitutional taking without just compensation in its August 11, 2022 opinion.

233.   When the Pennsylvania Supreme Court denied Twin Lake's Petition for Allowance of Appeal on March 7, 2023, the potential for state court review terminated in Pennsylvania.

234.   Middlesex is left with only the federal courts as a bulwark against the deprivation of its property without just compensation.

235.   Unless the PUC is enjoined from violating the Takings Clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, Middlesex will continue to suffer great and irreparable harm.

**COUNT SIX**
**Unconstitutional Conditions**
**42 U.S.C. § 1983**

236. Middlesex re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

237. A state may not condition a benefit or right that is generally available to others in that state on the surrender of a constitutional right. *Koontz v. St. Johns Water River Water Mgmt. Dist.*, 570 U.S. 595, 604-05 (2013).

238. Here, however, the PUC Order conditions the completion of Twin Lakes' 529 proceeding on Middlesex surrendering its due process rights and complying with the unconstitutional $1.675 million taking.

239. Further, the PUC is imposing a condition on Middlesex that has never previously been imposed in connection with any other Section 529 proceeding and is not found in the plain language of the relevant statutory provision or any relevant regulatory provisions.

240. By requiring Middlesex to waive its right against protection from unconstitutional takings, the PUC is mandating that Middlesex agree to an unconstitutional condition.

241. As the Commonwealth Court explained: "Section 529(e) of the Public Utility Code authorizes the PUC to approve or disapprove the negotiated price

reached by the parties to a Section 529 acquisition, **but it does not specifically authorize the PUC to impose conditions precedent to the negotiation and determination of that price or to impose an exit fee.**" **Exhibit B** at p. 17 (emphasis added) (citing 66 Pa. C.S. §529(e)).

242.   Based on reasoning that had not been discussed in the RD or the PUC Order, the Commonwealth Court surmised that the PUC could impose the escrow requirement by virtue of the PUC's powers to "impose such conditions as it may be just and reasonable" in connecting with the "granting" of a CPC and, subsequently, its power to "rescind or modify" its prior "regulations or orders." **Exhibit D** at pp. 17-20.

243.   Thus, it turns out that the PUC's imposition of the escrow requirement actually amounts to a retroactive amendment of a CPC from 2009 that was never issued to Middlesex in the first place.

244.   Under this logic, the PUC could require *any* utility to pay monies unrelated to whatever contemporary proceeding it may file before the PUC by retroactively amending the "conditions" attached to that utility's CPC.

245.   In reality, the new "condition" attached to the CPC is merely a boot-strapped taking of so-called "investments" that the PUC has determined the utility should have made in the past, but never took issue with in any base rate proceeding.

And, in any case, the PUC could not authorize recovery of or a return on such additional *retroactively* ordered investments.

246.   Now, however, that CPC comes with the "condition" that Middlesex agree to a $1.675 million unconstitutional taking as a requirement of the Section 529(e) proceeding initiated by Middlesex's affiliate, Twin Lakes.

247.   Middlesex has not located any authority indicating that the PUC has ever imposed an escrow requirement as a condition precedent for the issuance of a CPC.

248.   Further, the "condition" imposed by the PUC, by virtue of the Commonwealth Court's reasoning in hindsight, related to a CPC that was never issued to Middlesex, rather than Twin Lakes' petition under Section 529(e). In other words, the PUC has presented Middlesex with a *quid pro quo*.

249.   Under this PUC-mandated *quid pro* quo, Middlesex must now surrender $1.675 million in an unconstitutional taking without due process or just compensation as a "condition" of its never-issued CPC in exchange for the completion of Twin Lakes' Section 529(e) proceeding.

250.   Further, the escrow requirement is an unreasonable condition to impose in connection with a CPC.

251.   By way of example, the Commonwealth Court has previously found that a PUC order requiring a water company to "transfer the use, if not the

ownership" of its assets to another public utility "without just compensation" effectively "deprive[d]" a water utility "of its property" and, therefore was "unreasonable" as a condition to attach to a CPC. *Rheems Water Co. v. Pa. Pub. Util. Comm'n*, 620 A.2d 609, 612 (Pa. Cmwlth. 1993)

252.   Unless the PUC is enjoined from imposing unconstitutional conditions upon Middlesex in connection with Twin Lakes' 529 proceeding, Middlesex will continue to suffer great and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Middlesex respectfully requests that this Court order the following relief:

A.     On an expedited basis, pursuant to Federal Rule of Civil Procedure 57, the entry of a judgment declaring that the PUC lacks jurisdiction over Middlesex.

B.     On an expedited basis, pursuant to Federal Rule of Civil Procedure 57, the entry of a judgment declaring that Middlesex is not required post $1.675 million in escrow as a condition of the acquisition of Twin Lakes by Aqua, and the entry of a preliminary injunction prohibiting the PUC from requiring that Middlesex post $1.675 million in escrow as a condition of the acquisition of Twin Lakes by Aqua;

C.     For the entry of a permanent injunction prohibiting the PUC from applying 66 Pa. C.S.A. § 529 in a manner that impairs Middlesex's constitutional rights; and

41277612.8

D.     For the entry of an Order requiring the PUC to provide that Middlesex receives just compensation for any monies it is required to invest in the Twin Lakes System and a return on such monies during the time those monies were invested.

E.     For an award of attorney's fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

F.     For such further legal and equitable relief as the Court may deem just and proper.

*/s/ Matthew M. Haar*
Matthew M. Haar, Esq. (PA 85688)
SAUL EWING LLP
2 North Second Street, 7th Floor
Harrisburg, PA 17101-1619
(717) 257 – 7508
matt.haar@saul.com

Shane P. Simon, Esq. (PA 319643)
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7160
shane.simon@saul.com

March 20, 2023

41277612.8

<u>VERIFICATION</u>

I, Dennis W. Doll, declare as follows:

1.      I am the President and Chief Executive Officer of Middlesex Water Company, the Plaintiff in this present case.

2.      I have personal knowledge of the facts asserted in the foregoing *Verified Complaint for Declaratory and Injunctive Relief and Damages*, and if called on to testify, I would competently testify to the matters stated herein.

3.      I verify under penalty of perjury that the factual statements in the foregoing *Verified Complaint for Declaratory and Injunctive Relief and Damages* concerning Middlesex are true and correct. 28 U.S.C. § 1746.

Executed on March 20, 2023

*Dennis W. Doll*
Dennis W. Doll

41311460.1